We will hear argument now in the case of the United States v. Brooks. Mr. Betty. Good morning. May it please the court. I'm Jonathan Betty, and I'm going to be speaking for Thomas Brooks today. Mr. Brooks was charged with one count of 922 G. He pled guilty. He accepted responsibility and was in sentence to an above guideline sentence of 96 months when he was looking at a cap of 120 months. We are here essentially for two reasons. One, the facts do not support the legal conclusion that Mr. Brooks created substantial risk of bodily harm to another when he dropped his weapon. And two, that the district court erred in justifying the over guideline sentence by reasoning the switch on the weapon was not accounted for in the guideline. I'd like to start with the two-level enhancement of 3C.1.2 for reckless endangerment during flight. The government needs to prove a substantial risk of death, and not just some risk or a slight risk, but a substantial risk of death or injury. The district court ruled for three reasons that the enhancement should be applied. One, that an adult or child could have found the firearm and killed themselves or someone else. Two, that the gun was thrown and it could have discharged. And three, that the police pulling their weapons out during the chase could have caused a seriously bodily injury. So let me just pause on this. If all you were here to say is that 96 months is a pretty steep sentence for what seems to have happened here, this then 19-year-old person, I would agree with you. It's a high sentence. But on the other hand, the underlying facts are what the district court is weighing, and we review those deferentially. It's a Glock 26 with a switch. It's got 17 rounds of ammunition. There's a round loaded in the chamber. It's in a residential area. He says there are cars going back and forth. There are a lot of people around. Where's the clear error? Your Honor, the clear error is in the application of his analysis to the facts. I'm not disputing the facts there. But there surely is risk in this situation. You know, as it happens, the police ran up and they got the gun very quickly, but it's very near where people walk around. And I just, whether I would have ruled that way or not, I don't know why Judge Reinhart couldn't see it that way. Well, Your Honor, he shouldn't have seen it that way, and I don't think that there is risk. It's not just the standard isn't that there's some risk or that there's slight risk or there's possibility of risk. It's that there's substantial risk of great bodily harm or death. So if somebody had picked up this Glock, you know, with the load in the chamber and, you know, like a kid, an 11-year-old kid starts pulling the trigger, I can imagine that it's a difficult situation, not to mention that also in this scenario as he's running, the officers don't know what he's pulling out of his waistband. I guess it turns out to be an iPhone and a magazine, but they could have started firing. We see this constantly. Well, Your Honor, I'd like to address both of those issues. First, the idea that a child or somebody else could have picked up is pure speculation and not based on anything in the record. The record is— Well, it's based on the fact that it's in an apartment complex. It's in a place where people, presumably people of all ages, live. Sure, but it is not possible based on the record to reach that conclusion. The testimony by the officer that the government called during sentencing testified that the entire chase from when Mr. Brooks first came out of the apartment building to when he was detained was about 15 seconds, give or take. There were officers everywhere. The weapon was on the ground for about 45 seconds, give or take. There were officers everywhere. It is an illogical conclusion that somebody in the apartment building, a child, an adult, a senior citizen, whatever it would be, would see this chase happen, see officers all over the place, and decide to go retrace the steps of the path of flight. In some cases, that might be true, but the record does not support that conclusion here. There were officers everywhere. The body camera was shown by the government at sentencing. It was clear that this was essentially a secured location. It was a secured crime scene. People are not running in and out trying to find what was dropped. The other issue that the court relied on is that the gun could have discharged when it was thrown. And the government, I believe, conflates in their argument throwing and dropping. The officer who testified did not testify that the weapon was thrown. He said it was dropped and then another object was dropped. And I would submit that there was no evidence that the weapon was particularly able to be discharged. It was never tested. The power of the trigger wasn't tested by an expert to say that this gun was more susceptible to be fired. And it wasn't any evidence that it was cocked and so that it could go off when it was dropped. How would the officers have known that as they're chasing him? I mean, sometimes it happens that you can throw a gun on the ground and it'll fire, right? Absolutely. Absolutely, Your Honor. That is absolutely a possibility. But they don't know what the situation of this gun is, do they? How could they know? How could they know? But the government, after this was all over, could have presented some evidence at the district court to prove that. The district court just kind of assumes that without anything in the record to support that conclusion. The district court also explained that the police pulling their weapons could have caused death or seriously bodily injury. And again, the record is completely devoid of anything to substantiate that or rely on that. The officer didn't testify that he was about to shoot. He didn't testify that he even knew what he had. And I think, and I would submit to you that saying the officers are just going to shoot when they're chasing someone, I think, does a disservice to that officer. He was trained. He had nine and a half years on the force. There was no evidence that he was, for lack of a better word, a trigger-happy police officer. He was doing what he was trained to do. He wasn't about to shoot. And I think the district court relied on something that was not in the record when coming to that conclusion. And... One of the facts that the court did rely on was, in giving this sentence of 96 months, was that nowhere, at no point, had the firearm itself, the fact that it had been converted to what we, in essence, would be a machine gun. And was that factual determination in error? If I understand your question correctly, that Mr. Brooks transferred it into the switch? Well, he puts the switch on it, and that makes it satisfy the definition of machine gun. So there's no dispute that there was a switch on the weapon. There's no dispute that it was there. I don't believe that the district court found that it was Mr. Brooks who did the modification. It was just that he was in possession of it. The district court did erroneously rely on saying that there was no guideline to take that part of the weapon into consideration during his analysis. And I think he erred in doing that, because the guideline for an automatic weapon is clearly different than a non-automatic weapon. And that's why his base offense level was what it was, because the type of weapon was incorporated into the base offense level. I see I'm coming into my time. I'd like to reserve a little bit for rebuttal. It's an order to the counsel. Thank you. Ms. Anderson. May it please the court. My name is Theodora Anderson. I represent the United States. We are asking this court to affirm defendant's sentence. First, the district court did not clearly err in concluding that defendant's conduct during flight created a substantial risk of serious bodily injury to another person as required by guideline 3C1.2. The district court's findings, first, that defendant's conduct, one, involved discarding a loaded, chambered, modified, fully automatic— Did the district court err when it made the determination that Brooks' possession of a dangerous firearm had not been taken into account? No, Your Honor. The district court did not err in making that comment in coming to its sentence. Under guideline 2K2.1A4B for a 922G offense, the base offense level is 20 when, one, the offense involves a firearm capable of receiving a large-capacity magazine, or if the firearm applies under 26 United States Code 5845A, which would include a machine gun, and the definition of machine gun also includes the switch device itself making a firearm automatic. In this case, defendant possessed a firearm that had a large-capacity magazine attached to it and simultaneously possessed a second large-capacity magazine and possessed a firearm that had a switch added to it to modify it to be fully automatic. Therefore, the district court was correct that defendant's possession of the Glock with a switch attached to it did not individually impact his guideline range or his base offense level in conjunction with possessing— Didn't the plea agreement represent that the base offense level under 2K was taking into account that the gun in possession was both a large-capacity firearm and—the language in the plea agreement—and that it had the switch device attached. And for that reason, the government represented that the base offense level would be 20. Yes. The plea agreement contemplated that under both options, his base offense level would be 20. And the other argument of the court in commenting specifically that the adding of the switch was not contemplated by the guideline, what was particularly important to the district court was that the act of adding a switch to a handgun makes that firearm not just a firearm that is able to instantaneously shoot multiple bullets, but that in a handgun it is particularly harder to control than a traditional machine gun and therefore posed an additional danger to the general public, to this residential area, that bullets intended for one person— But really the representation was that this has not been considered. The idea of what the switch was able to do to the Glock to turn it in essence into an automatic, that had not been considered yet. And so for that reason, this is one of the reasons I'm justifying. He gave two facts for why he was giving this upward departure. And my question is zoning in on, does 2K not already take that into account? Under these circumstances, based on defendant possessing a—based on the plain language of 2K 2.1 A4B, you get to Section 1, which says that you possessed a large capacity magazine. The math, the guideline, the base offense level stops there. It does not increase. He already is at a base offense level of 20. So the fact that he also possessed a second large capacity magazine, which the court goes on just after that in the transcript to say that's an additional factor that was not considered by the guideline range, the second large capacity magazine, which I think tracks his whole reasoning of what he was saying about the switch being added. So the fact that he had the—while having a Glock switch would trigger 2K 2.1 A4B, it did not actually impact his guideline range. It was not—the calculus stayed the same. He was a base offense level of 20. And defendant's assertion, at least in the brief, that but for his possession of a switch of such a dangerous weapon, if he had just possessed a semi-automatic firearm, his base offense level would be lower is not true because of what I have just stated. Thank you. Moving to the record supporting the court's findings regarding the reckless endangerment enhancement, as is shown in the record, the district's court's findings about the danger of discarding a loaded, chambered, illegally modified, fully automatic handgun directly next to an apartment building near a sidewalk that led in and out of the apartment building and a parking lot at 12 p.m. during the middle of the day, in which you can see that the parking lot is full, that when they're there, it is—there are people going in and out. Someone comes out onto their porch. That is well-grounded in the undisputed facts in the record and reasonable and common-sense inferences made therefrom. The argument that because the police were able to successfully retrace the flight path of defendant, that that means that there is—the risk is nonexistent, we disagree with that. It is defendant is the one that created the substantial risk in the first place. Because the police were able to retrace their steps should not retroactively negate the risk that defendant himself created. And the district court made specific findings that defendant's actions were meant to hide the gun, that he saw police and he discarded the gun to hide it, and that if—but for the police finding it, the district court made specific findings based on the body-worn camera, the testimony, and the undisputed facts, that it would have been found quickly if the police did not find it. Additionally, the court was clear on its rulings related to the use of fire—or pulling firearms by law enforcement in this residential area during the middle of the day, and the risk of an accidental discharge in this area, not an occupied residential area during the middle of the day, would cause a danger of someone being shot, serious bodily injury, or death. And each of those findings, we would argue, is supported by the precedent of this court and supports the enhancement. Even if the court—even if this court were to find that the district court erred in implying the enhancement, the district court did make clear that based on its rulings related to the 3553A factors, that it would have sentenced defendant to the same sentence regardless of the application of the reckless endangerment enhancement,  If there are no further questions, we're asking that this court affirm defendant's sentence. Thank you. Thank you, Ms. Anderson. Anything further, Mr. Betty? Yes, Your Honor. Your Honor, the government states that it would be our position that discarding the gun would create a non-existent risk, and that misstates as a misunderstanding of what the enhancement is. It's a reckless endangerment during flight, and it has to be the defendant reckless created a substantial risk of death. Not some risk, not a little risk, but a substantial risk. And with all the police officers out there, with all of them doing their job, there was—there may be some risk, there may be a little risk, but that doesn't meet the standard of substantial risk of death of serious bodily injury. The government also talked about this being harmless error, and the guideline calculation must be done correctly. That's the starting point. That's what we have always said. It's 3553-4, I believe. And the Supreme Court and this court have affirmed that a defendant's guideline anchors the court's decision, the court's discretion in selecting an appropriate sentence, and that it must be done right. And in this case, the district court did not give an independent basis about why, if the enhancement wasn't applied, Mr. Brooks would still get the 96 months. And so this was not harmless, and it was not explained by the district court. I see my time is up. If there's no other questions, thank you. Thank you very much. And, Mr. Betty, we appreciate your willingness to accept the appointment and your assistance to the court and your client in this case. The case is taken under advisement.